[No. B215355. Second Dist., Div. Eight. Mar. 9, 2011.]

In re the Marriage of JANICE and ROMAN KOCHAN.
JANICE K. KOCHAN, Respondent, v.
ROMAN V. KOCHAN, Appellant.

COUNSEL

Law Offices of Brian G. Saylin and Brian G. Saylin for Appellant.

Rehm & Rogari and Joanna Rehm for Respondent.

OPINION

**BIGELOW, P. J.**—Family Code section 4320 provides that the family law court "shall consider" the "earning capacity of each party" in ordering spousal support, but the decision whether to order support based on a party's earning capacity rather than actual earnings is a matter within the court's discretion. (See, e.g., *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 825 [130 Cal.Rptr.2d 1].) In the case before us today, the family law court entered a spousal support order based in part upon a finding that a spouse with a 40-year employment history with the California State University could earn more income by taking his retirement from the California Public Employees' Retirement System (CalPERS), and returning to work with the university under its faculty early retirement program (FERP). In other words, the family law court ruled that the spouse's support obligation would take into account his earning capacity imputed from a CalPERS/FERP retirement scenario, rather than on his actual income from long-held employment. We reverse.

## FACTS

*Background*

Roman V. and Janice K. Kochan married in July 1982.[1] In November 2006, Janice left the family residence, and moved into her mother's home. Roman was 65 years old when the parties separated; Janice was 50 years old. In February 2007, Janice filed a petition to dissolve the parties' marriage.[2]

Roman started working at California State University, Long Beach (CSULB) in 1969, and continued working at CSULB throughout the parties' marriage. At the time of trial and judgment, he remained employed at CSULB. His current position is dean of library services at CSULB. Janice

---

[1] As is common in family law proceedings, we use the parties' first names for purposes of clarity. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475–476, fn. 1 [274 Cal.Rptr. 911].)

[2] By the time the family law court entered judgment of dissolution, the Kochans' children were adults. There are no child-related matters material to the issues on appeal. As a result, we omit such elements of the proceedings below.

earned a bachelor's degree shortly after she married Roman, but primarily worked in the family home during the marriage. She began working part time in one of CSULB's academic advising departments after the parties' youngest child started elementary school.

## The Family Law Proceedings

In June 2007, the family law court issued pendente lite support orders. The court found that Roman had a gross monthly income of $12,190, while Janice anticipated a gross monthly income of $3,833. The court ordered Roman to pay spousal support to Janice in the amount of $2,261 per month, retroactive to March 1, 2007. The court deferred to a later date the issue of attorney fees.

In August 2007, Janice filed an order to show cause (OSC) to modify the support orders. The evidence at the hearing on Janice's OSC showed that she was not working.[3] Roman's income remained the same at $12,190 per month, but he was then also receiving Social Security benefits in the amount of $2,141 per month. In October 2007, the family law court issued modified support orders. The court increased Roman's spousal support obligation to $3,772 per month, and ordered Roman to pay $5,000 for Janice's attorneys' fees at a rate of $500 per month. The court appointed a pension expert to examine and report on the value of Roman's CalPERS pension, and reserved the issue of the expert's fees.

In November 2007, Roman filed a chapter 7 (liquidation) bankruptcy petition. Roman's bankruptcy petition listed secured debts including mortgage loans with a first and second trust deed on the family residence, a lease on Janice's car, and a loan on another vehicle. He listed another $100,000 (rounded) in unsecured community debts, including the $5,000 in attorneys' fees that the family law court had ordered him to pay in the dissolution action.[4] In February 2008, Roman served and filed written notice advising the family law court and Janice of the automatic stay in his bankruptcy action.

## Trial

Over several trial days from March through October 2008, the family law court tried issues exempt from the bankruptcy stay, including spousal support, attorneys' fees, and division of Roman's CalPERS pension. Janice testified on

---

[3] The evidence showed that Janice suffered from depression after the parties' separation, and that she was receiving medication and therapy. In addition to the divorce, her father had recently died, and her mother had been treated for cancer. Janice herself had undergone thyroid surgery.

[4] Roman's bankruptcy petition further noted that additional attorneys' fees in the amount of $27,000 had been requested.

her own behalf and called the following witnesses: Henry DuBois (a former coworker of Roman's at CSULB, now retired), Mark Tubbiola (a forensic economist), Barbara DiFranza (a certified family law attorney specializing in pension plans), and Gail Billings-Beck, Ph.D. (Janice's mental health counselor). For his part, Roman testified on his own behalf and called Denise Torres (Janice's sister).

By the end of trial, the evidence established the following facts. Roman's current earnings from CSULB were $13,013 and his Social Security benefit was $2,190, for a gross monthly income of $15,203. Secured debts included the mortgage on the family residence ($3,233) and a car loan payment ($270), both of which Roman had affirmed in his bankruptcy case. Roman, however, had stopped paying the mortgage in February 2008. Janice had no income other than spousal support; her disability benefits had expired.

The actuarial value of Roman's CalPERS retirement benefits as of October 2007 was $1,512,881, and the community's interest in those benefits was $1,010,302. The value of the community's interest in the pension plan peaked as of the date of the parties' separation, and was decreasing so long as Roman continued to work, because Roman had reached the maximum multiplier used to determine plan payments due to his more than 40 years of service. By continuing to work, Roman was causing the actuarial value of his pension (and its value to the community) to decrease each year. This issue is discussed more fully below. Although the loss would be offset against annual increases resulting from added service years and any increase in salary, those increases would accrue to Roman's separate property interest in the plan.

Roman's decision not to retire reduced the overall value of his CalPERS pension because, in the words of the forensic economist, "if you give up your retirement for three or four years, you're going to [give] up all payments [during those years], and then the rest of the future years are going to be not as valuable because you're going to be older when you start your benefits." A *Gillmore* order (see *In re Marriage of Gillmore* (1981) 29 Cal.3d 418 [174 Cal.Rptr. 493, 629 P.2d 1] (*Gillmore*)) would cut off losses to the community interest in the retirement from Roman's continued employment, but not without other factors coming into play.[5] By effecting an immediate *Gillmore* order, Janice would forego the benefit of Roman's future salary increases, if

---

[5] In *Gillmore*, the Supreme Court approved the practice of ordering a party to make payments immediately to a former spouse—outside of a pension plan's rules—in order to prevent the party with the pension plan from timing his or her retirement to deprive his or her former spouse of his or her community interest in the pension. (*Gillmore, supra*, 29 Cal.3d at pp. 422–429.) Stated another way, a party who has a vested and matured retirement may elect to retire, with the pension benefits divided according to an appropriate community division, or the party may elect to continue working, and pay his or her former spouse an amount equivalent to the former spouse's community interest in the pension.

any. In the event Roman died before retiring, Janice's share of the pension would be limited to a return of Roman's contributions (roughly $300,000), six months of salary ($78,000), and a lump-sum death benefit ($5,000), all of which would be less than the present value of Janice's interest in Roman's pension.

A number of different retirement options were available to Roman from CalPERS, but he could not elect an option until he actually took his retirement. If Roman retired immediately, his monthly benefit would be $11,200, the community interest in that benefit would be $7,822, and Janice's share would be $3,911. CalPERS would not set up a separate account for Janice because she was not of retirement age.[6]

Under the terms of a collective bargaining agreement between CSULB and certain of its employees, FERP benefits were available to Roman. Under FERP, an employee may begin a service retirement and be rehired concurrently at the same pay scale, working half time. If Roman elected to participate in FERP, he would receive full retirement benefits from CalPERS, plus FERP income for half-time employment, and thereby increase his current income by 50 percent. Roman would also proportionally increase his net disposable income because his current income is subject to Social Security taxes and CalPERS contributions, but FERP income is not.

The FERP process in practice was explained through Henry DuBois's testimony. If Roman took FERP benefits, he would have worked at CSULB for 41 years when he exercised his rights. Although he would no longer be recognized as an administrator in that he would become a faculty member senior librarian, he would continue to earn the same salary scale and continue to perform the same job duties. The only material difference would be that he would work two and one-half days a week, and he would not hold his former title. He would receive his full CalPERS retirement, and would be paid at his same salary scale. He would receive pay raises, and accrue sick days and vacation, and health and other benefits as he did before FERP, but at half-time rates. He would no longer contribute to CalPERS. When the court asked whether the university may reject a person's request to participate in FERP, DuBois answered that it was a contract guaranteed benefit. A formal application must be made, but the university would approve it. DuBois was not aware of FERP benefits being denied to any person who had applied to

---

[6] Following the evidence regarding Roman's CalPERS pension, and with the assistance of witness DiFranza, the parties stipulated to a *Gillmore* order. The order provided for Roman to begin making *Gillmore* payments to Janice beginning July 1, 2008, and to terminate on the death of either party or Roman's retirement. The initial payment was $3,320.11. The *Gillmore* order was subsequently incorporated into the final judgment of dissolution.

participate in the program. However, he recalled that some had been asked to leave the program in the 1990's due to financial conditions facing the university.

Janice remained on disability leave, and was taking medication for depression, anxiety and insomnia, and receiving therapy from Dr. Billings-Beck. It was Dr. Billings-Beck's opinion that Janice suffered a major depressive episode in July 2007, and that, while she was improving through therapy, she needed continued therapy for an unknown length of time. Janice's prognosis for returning to gainful employment, even part time, was unknown, but she was not malingering. Given Janice's fear of Roman, it would be unreasonable for her to resume her former employment at the CSULB campus.

Janice intended to obtain a master's degree, which she estimated would take three to four years. She had looked for an apartment, but was still living with her mother; she had no significant savings. She paid $567 per month for a lease on her Lexus. She and Roman had filed separate tax returns, but she still owed taxes because Roman had claimed "head of household" on his tax return, and taken all of the allowable "dependency deductions."

Roman did not want to use the FERP benefit. He enjoyed his work and did not want to retire. Once he retired, he was not going to work. When he filed bankruptcy, the community obligations were current. After filing for bankruptcy, he stopped paying their debts, except for a car payment and the house payments. In February 2008, he stopped the house payments because, he said, there "was no value in the house." Although his testimony regarding the family residence asset was somewhat defensive and evasive, he acknowledged that Janice had requested that the family residence be listed for sale, and that he had not "gotten around" to addressing a sale. He did not want to use the FERP benefit, even if it would increase his income enough to save the house.

*The Statement of Decision, Order for Attorneys' Fees and Judgment*

On July 18, 2008, the family law court orally issued its intended decision on the litigated issues, and directed Janice's counsel to prepare a written statement of decision and judgment. The court took the matter of attorneys' fees under submission.

On October 31, 2008, Janice's counsel submitted a declaration and supporting documentation requesting attorneys' fees and costs totaling $185,897.65. Roman filed an opposition. On November 25, 2008, the court issued a written tentative decision on attorneys' fees which then became the court's statement of decision. The court found that Janice's reasonable attorneys' fees totaled $120,458.

On February 9, 2009, the court signed and filed a stipulated amended statement of decision, along with its final judgment. The judgment and statement of decision together include findings that the actuarial value of the community interest in Roman's CalPERS retirement as of the date of trial was $1,040,201, and that Janice's share was $520,100. The court acknowledged that it could not "compel" Roman to retire. However, it found his decision not to retire constituted a "failure to maximize the value of the community's interest in his CalPERS pension in violation of [his] fiduciary duties to the community. . . ." The court determined that Janice was entitled to compensation for the loss caused by the breach of fiduciary duty.

The court also found that Roman had breached his fiduciary duties regarding the family residence by not paying the mortgage when able to do so, and by not cooperating in listing it for sale so as to minimize losses to the community. The court reserved jurisdiction over the residence, and ruled that the measure of damages would be determined by proof upon final disposition of the property.

The court ruled that it could not assign any community debts to Roman because of the discharge entered in his bankruptcy proceeding, and, on that basis, allocated all of the community debts to Janice, subject to consideration of that allocation "in determining the spousal support to be ordered."

The court ordered Roman to pay spousal support of $2,800 per month until either party's death, Janice's remarriage, or further order of the court. Janice was ordered to notify counsel within 48 hours of becoming employed. The judgment incorporated the court's order to award attorneys' fees in the amount of $120,000 (rounded) to Janice's counsel.

The court's statement of decision includes this paragraph: "The Court cannot require [Roman] to retire or to exercise the FERP option. However, this Court can compensate [Janice] for [Roman]'s failure to maximize the return to the community. . . . [The evidence shows that if Roman] were to retire at this time and exercise the FERP option, he would receive $13,013.00 per month in retirement payments. From that, he would deduct the $3,320.00 per month which he would pay to [Janice] . . . under *Gillmore*. In addition, he would receive $2,190.00 per month in Social Security benefits and a salary of $6,507.00, giving him a total income of $18,390.00 per month, after [Janice]'s portion of the retirement was deducted."

## DISCUSSION

### I. *Spousal Support*

Roman contends the family law court's spousal support order must be reversed because the court abused its discretion by basing support on his

earning capacity, rather than his actual current income. We reframe the issue: Should the family law court have fixed Roman's spousal support obligation based on his actual earnings of $12,000 per month or on his "earning capacity" of $18,000 per month in a CalPERS/FERP retirement?[7] We agree with Roman that the court abused its discretion by basing support on the greater income figure.

■ At one time, our courts followed the so-called *Philbin* rule (see *Philbin v. Philbin* (1971) 19 Cal.App.3d 115 [96 Cal.Rptr. 408]) when it came to considering a spouse's earning capacity, as distinguished from his or her actual income, in fixing a support order. Under the *Philbin* rule, a court in fixing spousal support could consider a party's earning capacity only when it appeared from the record that there was "a deliberate attempt" on the part of the party to avoid his or her support obligation "*by refusing to seek or accept gainful employment . . . .*" (*Id.* at p. 121, italics added.) In other words, a court could fix support based on earning capacity only when the evidence indicated that a party was "*intentionally depressing* his [or her] income to an artificial low . . . ." (*Ibid.*, italics added.) Under today's family law statutes and jurisprudence, a deliberate attempt to depress income remains the "usual" factual circumstance in which the family law court will base support on earning capacity, but bad faith is not a required factor. (See, e.g., *In re Marriage of Ilas* (1993) 12 Cal.App.4th 1630, 1634–1638 [16 Cal.Rptr.2d 345] (*Ilas*).) Instead, support must be based on an assessment and balancing of the enumerated statutory criteria regardless of evidence showing a deliberate attempt to avoid a support obligation. (*In re Marriage of Stephenson* (1995) 39 Cal.App.4th 71, 74, 79–80 [46 Cal.Rptr.2d 8]; *In re Marriage of Simpson* (1992) 4 Cal.4th 225, 230–233 [14 Cal.Rptr.2d 411, 841 P.2d 931].) The final decision on a spousal support order is a matter to be determined in the court's discretion. (*In re Marriage of Rosen, supra,* 105 Cal.App.4th at p. 825.)

None of the authorities cited in the parties' briefs on appeal directly addresses the issue presented in this case. That is, may the family law trial court, in fixing the level of spousal support, consider the added income a party would earn by taking retirement and then returning to work? Roman cites *In re Marriage of Reynolds* (1998) 63 Cal.App.4th 1373 [74 Cal.Rptr.2d 636] (*Reynolds*) in support of his argument that "no one may be compelled to work after the usual retirement age of 65" in order to pay spousal support. He contends that by implication this means no party may be required to retire at

---

[7] For ease of discussion, we use rounded figures. And, in accord with the trial court's approach, we address the spousal support issue after accounting for Roman's *Gillmore* payment effecting the division of the community's interest in his pension. Under this accounting, Roman would receive $10,000 net pension after *Gillmore*, plus $2,000 from Social Security, plus $6,000 from FERP employment.

the usual age of 65 in order to pay support. For her part, Janice cites *In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212 [45 Cal.Rptr.2d 555] (*Padilla*), and *Ilas, supra,* 12 Cal.App.4th 1630 in support of her argument that the published cases reject the proposition that a spouse's "employment decisions for reasons personal to [him or her]" may trump the spouse's support obligation when those decisions are "harmful to those to whom [he or she] owed a duty of support."

As we have noted, these cases do not directly address the issue of the propriety of a spousal support order which may effectively require a party to elect between taking a retirement to pay a spousal support order, or risking a failure to pay the support order. In *Reynolds*, a 66-year-old physician spouse suffered a leg injury, lost his job, realized it was "finally time to retire," and sought a reduction in his spousal support obligation. The family law court partially reduced support, but largely "refused to recognize the effect" of the retirement in making its order, imputing income based on the physician spouse's ability to work. The Court of Appeal reversed, concluding that the family law court's order effectively required the retirement-age physician spouse to continue working. (*Reynolds, supra,* 63 Cal.App.4th at pp. 1375–1380.) The Court of Appeal determined: "Just as a married couple may expect a reduction in income due to retirement, a divorced spouse cannot expect to receive the same high level of support after the supporting spouse retires." (*Id.* at p. 1379.)

In *Padilla*, a father left his job in good faith to start a new business, and sought modification of child support payments. The family law court imputed income of nearly $6,000 per month, notwithstanding that the evidence showed his actual earnings were in the range of $1,500 per month. The Court of Appeal affirmed, finding there had been no abuse of discretion. (*Padilla, supra,* 38 Cal.App.4th at pp. 1214–1216.) As the Court of Appeal explained, the predominant guiding factor in the *child support* context is the best interests of the child. In *Ilas*, a 39-year-old pharmacist sought to obtain a reduction in child and spousal support because he had decided to resign his job and attend medical school. The family law court said no, even if he was acting in good faith. Again, the Court of Appeal affirmed. (*Ilas, supra,* 12 Cal.App.4th at pp. 1637–1639.)

We believe that *Reynolds* offers the more analogous reasoning in considering how to evaluate the retirement factor on a spousal support order and where child support is not a concern. We hold that the family law court abuses its discretion when it bases an order for spousal support on a finding that a spouse's present earnings from long-term employment can be *increased* by taking a retirement, and returning to work in an available, but different, position. In our view, the family law court should no more enter an order that

will effectively require a spouse to take a retirement than it should enter a support order that effectively requires a spouse to forego retirement. (*Reynolds, supra*, 63 Cal.App.4th at pp. 1375–1380.) We are also concerned that a rule allowing consideration of increased income from a retirement/reemployment scenario may be troublesome in other situations. For example, in the event a long-seated judicial officer were to divorce, may the family law court consider the likelihood that he or she would earn significantly greater income in private practice or by becoming a private judge? If a long-employed physician at a public health clinic divorces, may the family law court consider the likelihood that he or she would earn significantly greater income by taking employment with an HMO or private hospital? Should a long-term science or math teacher's support obligation be measured by the income earnable in a corporate position? We decline to accept the proposition that consideration of increased income from an alternative to long-held employment is similar to consideration of the income a party foregoes by walking away from his or her current employment.

We recognize that the family law court's decision in the current case is a bit more nuanced than simply imputing greater income from a CalPERS/FERP retirement. Specifically, the court found that Roman's decision not to retire caused a loss to the community. We find this nuance does not compel a different result inasmuch as the same end point is reached whether the retirement element is viewed as a damage-causing act, or as a straightforward imputing of income based on earning capacity rather than actual income. We are careful to note that we do not see any facts or findings in the current case suggesting there may have been an attempted manipulation of the retirement factor to the detriment of the former spouse. The evidence did not establish that Roman had planned on retiring, but then altered those plans to prevent an anticipated increase in income. In the final analysis, we are satisfied that a spouse who continues working in a long-held position should not have his or her support obligation based on his or her earnings capacity measured by some alternative employment scenario.

## II. *Attorneys' Fees*

Roman contends the family court's order awarding $120,000 in attorneys' fees to Janice's counsel must be reversed because it "countermands the orders of the bankruptcy court." More specifically, Roman argues the family law court predicated its decision to award attorneys' fees on the fact that Roman had filed a bankruptcy petition. According to Roman, he "has been sanctioned in the order of fees for his exercise of his right to file bankruptcy." Roman also argues the family law court abused its discretion by awarding attorneys' fees without consideration of his ability to pay. (See Fam. Code, § 2030, subd. (a).) We decline to reverse the judgment on the ground argued by

Roman, but agree that the issue of attorneys' fees should be revisited because the existing orders appear to be based, at least in part, on Roman's earning capacity, rather than his actual income.

These are Roman's calculations and his analysis: "[He] had only $3,600 left after payment of taxes and his support and *Gillmore* payments to Janice. . . . He could not afford to pay the $3,400 for the residence . . . He had his own attorney's fees to pay and, although they paled in comparison to the fees charged by Janice's attorney, [they] were substantial given his own resources. [¶] While the court made mention of these burdens, there is no evidence that it actually considered them. The court swept them aside saying that Roman had an earning capacity of $21,000 per month and could therefore afford the fee order."

We see nothing in the record to support Roman's claim that the family law court did not consider the parties' respective burdens when it determined the issue of attorneys' fees. The court's determination was based on earnings capacity, rather than Roman's actual earnings, and it is those predicate figures that have affected the attorneys' fee award, not any omission on the part of the court to consider any relevant factor under the codes. Because we have determined that the family law court should revisit the issue of spousal support based on Roman's actual current income, and because the attorneys' fee issue is also related to the parties' respective financial circumstances, we agree with Roman that the court should reconsider the award of attorneys' fees on remand, taking into consideration his actual earnings.

■ To the extent Roman appears to argue that all of the attorneys' fees incurred by Janice up to the date he filed his bankruptcy petition were discharged in his bankruptcy case, we do not agree. The only fee-related "debt" actually owed by Roman on the date he filed his bankruptcy petition in November 2007 was the order issued by the family law court in October 2007 directing Roman to pay $5,000 to Janice's counsel. To the extent Roman appears to argue that the trial court could not order any attorneys' fees payable by Roman, we do not agree. The bankruptcy statutes provide that a petitioner's domestic support obligations are not dischargeable in bankruptcy, and attorneys' fees orders in dissolution actions are encompassed in this rule. (11 U.S.C. § 523(a)(5); *Jones v. Tyson* (9th Cir. 1975) 518 F.2d 678, 680.)

III. *The Family Residence: The Possession and Use Issue*

Roman contends there is no substantial evidence to support the family law court's finding that Janice "couldn't come to the [family] house." The legal significance of this attack on the court's finding is difficult to discern from

Roman's opening brief. Even so, there is evidence in the record to support the court's finding that Janice did not and could not live in the family residence.

In orally pronouncing its decision, the family law court addressed the issue of the family residence by expressly finding that Roman had "exclusive use and occupancy" of the community asset after Janice moved out in November 2006. The court further found that Roman had "failed and refused" to make the mortgage payments, which put the loan on the property into default, and placed the home in jeopardy of foreclosure. The court found he had income of $15,200 per month and that his debts had been discharged in bankruptcy. Further, that after the bankruptcy, the only debt he needed to pay was the mortgage of $3,400 per month, which would have saved the home. The court found that Roman "was able to pay this debt and preserve this asset, but he chose not to do it." The court then found that Roman had expressly admitted, "I don't care about the house." It also found that although he had exclusive use and possession of the house, he had deliberately chosen not to put the house on the market. In that same vein, the court found that, when Janice's attorney requested that the house be put on the market for sale, Roman "put the onus on [Janice] to sell the house." This, notwithstanding that she could not go to the home if Roman was present because a restraining order had been issued requiring Roman to stay 100 yards away from her.

Roman appears to argue that to the extent the community suffered any loss from failing to sell the family residence, the family law court's finding that he caused that loss is not supported by substantial evidence. Roman seems to suggest that the trial court failed to consider that Janice had equal access to the property to put it on the market. Roman is simply not correct. The evidence is undisputed that, at all times after November 2006, Roman had exclusive use and occupancy of the family residence. Accordingly, the trial court reasonably inferred that any loss from the nonsale of the family residence was attributable to Roman.

IV.   *The Family Residence: The Mortgage Issue*

Roman next contends there is no substantial evidence to support the family law court's finding that he was able to pay the mortgage. We decline to reverse the judgment on the ground argued by Roman.

In the judgment entered February 9, 2009, the family law court found that Roman had breached his fiduciary duties to Janice by failing to pay the mortgage *and* failing to cooperate in selling the house. We construe the court's finding to be an indivisible two-part assignment of fault. The court further found that it was not possible, given the state of the existing evidence,

to determine whether the community had suffered any damage from Roman's actions. In other words, the court could not determine whether Roman's actions in failing to sell the residence had resulted in a loss of equity or other damage. The court reserved jurisdiction over the residence.

We disagree with Roman's claim that the evidence does not support the family law court's conclusion that he breached his fiduciary duty to preserve a community asset. Viewed in accord with the substantial evidence standard of review (see, e.g., *Estate of Leslie* (1984) 37 Cal.3d 186, 201 [207 Cal.Rptr. 561, 689 P.2d 133]), we find the record discloses evidence supporting the court's finding that Roman did not act reasonably to preserve whatever value could be salvaged from the residence. In our view, the evidence establishes that Roman just did not want to take any responsibility, or exert any effort, to preserve the value of the residence through a sale. Whether or not the failure to sell has *caused any actual loss* has yet to be determined by the family law court, and Roman is not barred from litigating such issues at the appropriate time. It may well be that the debt owed on the residence exceeded its value, in which case Roman's acts would not have caused any loss in any event. At this point, it is too early to address such matters.

## V. *The Marital Living Standard*

Roman contends the family law court's judgment is infected with error because the court failed to consider the marital living standard, and because this failure to apply the law has resulted in a spousal support order which will allow Janice to enjoy a substantially higher living standard than he will enjoy. In sum, Roman argues that the family law court's judgment must be reversed because it abused its discretion by issuing a spousal support order that "leaves the parties at significantly different standards of living." (Citing *In re Marriage of Andreen* (1978) 76 Cal.App.3d 667 [143 Cal.Rptr. 94]; *In re Marriage of Mastropaolo* (1985) 166 Cal.App.3d 953 [213 Cal.Rptr. 26].) In light of our conclusion that the family law court should have considered Roman's actual earnings, and not his earnings capacity based on a CalPERS/FERP retirement scenario, we decline to address whether there is an unsustainable income disparity between Roman and Janice. At the time a determination on the amount of spousal support is made based on Roman's actual income, the issue of any disparate income level may be revisited.[8]

---

[8] By Roman's calculations, the judgment in the family law court will provide Janice with "an income from Roman of $6,120," whereas he "has only $3,600 of net income after his support and *Gillmore* requirements." It appears that Roman may be contrasting Janice's gross monthly income before taxes, against his net monthly income after taxes and contributions to his CalPERS pension (which may be fairly viewed as a form of savings in his own pocket for his future benefit). We express no view on how the parties' respective incomes should finally be balanced, but any comparison must actually be a comparison in like circumstances.

We see nothing in the record to support Roman's claim that the family law court failed to consider applicable law. We also note that his argument cites us to nothing more than the court's final decision in support of his claim. If the family law court's orders resulted in an unsustainable imbalance in the parties' incomes, that does not indicate that applicable law was not considered.

VI. *Adequacy of the Record*

Roman argues the family law court's judgment must be reversed because a "full [clerk's] transcript is not available," and it "does not appear that the record can be fully reconstructed." He does not explain what document is missing, but says that his right to appeal has been diminished. He tells us he is "able to find no cases which cover the issue of what occurs when a full transcript is not available," but offers that an appropriate remedy would be a new trial. Roman's arguments fail for a number of reasons. Most obviously, he has failed to show us that any purported error has resulted in prejudice.

## DISPOSITION

The judgment is reversed, and the cause is remanded to the family law court with directions to enter a new judgment in conformity with this opinion. The parties are to bear their own costs on appeal.

Flier, J., and Grimes, J., concurred.