Filed 10/27/20  Marriage of Blake and Langer CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Marriage of MEREDITH BLAKE  and JEREMIAH MICHAEL LANGER. | B298280<br><br>(Los Angeles County  Super. Ct. No. 17STFL04444) |
| MEREDITH BLAKE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JEREMIAH MICHAEL LANGER,<br><br>    Defendant and Respondent. | |

APPEAL from orders of the Superior Court for Los Angeles County, Joshua D. Wayser, Judge.  Affirmed.

O'Melveny & Myers, Caitlin Bair, Scott Schaeffer, Jared R. Ginsburg, Gregory F. Jacob, Patrick Jones; and Meredith Blake, in propria persona, for Plaintiff and Appellant.

Stephen Temko for Defendant and Respondent.

Appellant Meredith Blake appeals from two attorney fee orders and an order granting respondent Jeremiah Michael Langer's motion for joinder in this marital dissolution action. With regard to the attorney fee orders, Blake raises several mostly procedural issues, none of which warrants reversal, as well as a legal issue that is moot in light of subsequent events. With regard to the joinder, Blake contends in her separate appellant's opening brief[1] that the family court erred in allowing the joinder because the primary basis for joining the third parties—to prevent the transfer of a term life insurance policy from one trust to another—no longer exists because the policy has lapsed. Langer agrees that the issue of the transfer of the life insurance policy is moot in light of the policy's lapse, but argues there were other grounds for the joinder, which Blake did not specifically address in her opening brief. Langer asserts the family court did not abuse its discretion by allowing joinder based on those grounds. Although Blake contends in her reply brief that she did argue that joinder on those others grounds was improper, we find her discussion in her opening brief was inadequate to preserve the issue, and therefore she has forfeited it. Accordingly, we affirm the challenged orders.

---

[1]    There are two appellant's opening briefs filed on behalf of Blake. The first, in which Blake is represented by counsel, addresses only the attorney fee orders. The second, in which Blake represents herself, addresses only the joinder.

## BACKGROUND

Blake and Langer married in September 2004 and separated on June 25, 2017 after Blake discovered that Langer was having an affair. Blake and Langer have two children, Max and Henry, who were 11 and 8 years old, respectively, at the time of the separation. Blake is the founder, owner, and CEO of ProSocial, LLC, "a strategy consulting and campaign management firm in the business of high-impact social change." In 2016, she reported $366,158 in income from the company. At the time of the separation, Langer was unemployed (although he did some private coaching for youth basketball and soccer players), having lost his job as a television sports programmer in February 2017; in 2016, he reported earnings of $262,855. The couple owned a home that had a market value of between $3.8 million and $4.3 million, with an encumbrance (a private loan from Blake's brother, Daniel Wohl) of approximately $1.45 million. In addition, Blake and Langer each had retirement accounts; Blake had more than $600,000 in her accounts, and Langer had $300,000 to $400,000 in his accounts.

In September 2017, Blake and Langer entered into a separation agreement and stipulation (the Stipulation) that had been prepared by Blake,[2] in which they agreed "to defer [until at least January 30, 2018] the disclosure/discovery phase of the settlement phase, of the dissolution of marriage process, so that [Langer] can focus on his continued treatment and recovery regarding serious medical/mental health issues." The Stipulation set forth various terms (which,

---

[2]      Blake is a licensed attorney, although she does not practice law.

according to the Stipulation, were based upon the findings and recommendations of Langer's treating psychologist) regarding custody of the children, child support, control of funds for Langer, expenditures from Langer's funds, and occupancy of the family residence. The Stipulation gave Blake sole legal and physical custody of the children (with child support to be paid by Langer) and exclusive possession of the family residence, as well as complete control over community property funds and access to Langer's account statements for any separate property accounts. The Stipulation also required Langer to continue with and adhere to his treatment, prohibited Langer from having any interaction with teachers or parents of students at the children's school, and required him to limit his interaction with female parents of children on teams he was coaching, or other females who were present.

In accordance with the terms of the Stipulation, Blake filed the dissolution of marriage action, and the Stipulation was entered as an order of the family court on September 22, 2017. Also in accordance with the Stipulation, both parties initially appeared in propria persona and the dissolution action was suspended until at least January 30, 2018. It appears that despite appearing in propria persona in court, Blake had retained attorney Lori Loo before the Stipulation was drafted; Langer retained counsel in January 2018, around the time the suspension of the dissolution action was lifted.

Litigation of the dissolution action has been extremely contentious, generating hundreds of thousands of dollars in attorney and accountant fees by the time of the orders at issue. Because of the

narrow issues presented in this appeal, however, we will limit our discussion to the relevant events.

## A.  *Langer's First Request for Fees*

On May 21, 2018, Langer filed a request for order (RFO) for child support, spousal support, and $250,000 in need-based attorney fees and costs (including accounting fees).  In a declaration supporting his request, Langer stated that he had incurred more than $50,000 in attorney fees and costs from January through April 2018, and would incur no less than $100,000 in additional attorney fees and $75,000 to $100,000 in forensic accounting fees going forward.  He declared that he had paid his attorneys an initial retainer of $10,000, which he had borrowed from his father, and that he had no income or access to funds other than retirement accounts (he stated that he had been paying his expenses with credit cards, and had to withdraw $30,000 from his retirement account, for which he will be subject to taxes and penalties).  Finally, he declared that Blake reported in her Income and Expense Declaration (I&E) that as of April 2018 she had paid her attorneys $57,995 and still owed them $34,758, and that she had already engaged a forensic accounting firm.[3]

---

[3]   We rely upon Langer's statement in his declaration for this information because Blake failed to include in her appellant's appendix most of the exhibits that were referred to in (and presumably attached to) the various declarations, forms, and other documents she included in her appendix.  The absence of those exhibits—as well as Blake's failure to include several documents that were before the family court when ruling on the orders at issue in the appeal (some of which Langer included in his respondent's appendix)—has hampered our ability to determine exactly what information

Langer's RFO also was supported by the declaration of Langer's attorney, Elyse R. Margolin, of the Law Offices of Levin & Margolin, and his forensic accountant, Jeremy Salvador. Margolin provided information about her background and experience, as well as her hourly rate and that of her associates. She set forth the amount her firm had been paid thus far, the amount of fees and costs she estimated had been incurred through April 2018, listing the tasks for which those fees had been incurred (she attached the billing statement for January—which Blake did not include in her appellant's appendix—and stated that the firm's billing statements for the months of February through April had not yet been finalized), and estimated that Langer would additionally incur no less than $100,000 in attorney fees and costs in the future, providing a list of specific tasks she expected would have to be performed. Margolin also presented evidence regarding Blake's ability to pay, including ProSocial's tax records from 2011 through 2016, and ProSocial's and Langer's most recent bank records—none of those records, however, are included in the appellant's appendix.

_____

was before the family court. While Blake's failure to include these exhibits and documents provides a basis to dismiss her appeal (*In re Marriage of Wilcox* (2004) 124 Cal.App.4th 492, 498), we will instead analyze the issues presented based upon the materials provided to us and inferences we can make based upon those materials and the family court's orders, keeping in mind that the lower court's orders are presumed correct. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609 ["'In the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court. "[I]f any matters could have been presented to the court below which would have authorized the order complained of, it will be presumed that such matters were presented"'"].)

Forensic accountant Salvador, of Miod and Company, provided information about his background and experience and that of Donald J. Miod, who directly supervises his work, as well as the hourly rates charged by those who would be working on the matter. He provided detailed information regarding the accounting work he expected to do, listing each task, and the estimated low and high number of hours and fees for each task. He estimated the total amount of accounting fees would be between $75,000 and $100,000, and noted that his firm had been paid nothing thus far.

Langer filed his I&E the same day he filed his RFO, May 21, 2018. In it, he reported receiving no income in the previous month, and three sources of income over the previous 12 months: unemployment benefits that terminated in March 2018 ($1400/month), seasonal private coaching that ended in January 2018 ($658/month), and a severance package in the amount of $55,063, which was paid biweekly and ended in mid-May 2017. He also reported having $16,698.85 in cash and bank accounts, and other assets (consisting of the value of ProSocial, which he describes as a community business, the family residence, financial accounts, and retirement accounts) worth in excess of $7 million.

The hearing on the RFO was continued to July 30, 2018. Blake filed her opposition to Langer's RFO, along with supporting declarations and an updated I&E, on July 17, 2018. In her declaration, Langer explained that her business, ProSocial, is a small company (four

employees) with fluctuating income[4] because it does short-term project work and does not have any clients with dependable, long-term contracted recurring fees. She stated that the company depends upon her for business development, but she has had less time to devote to obtaining business due to Langer's conduct and the break up of her marriage. She also explained that the volume of business ProSocial was able to solicit had diminished over the previous 12 months as there was more competition from larger agencies, and because more potential clients discovered they could do the same work in-house. Therefore, she stated that the net income for the company in 2018 was expected to be $220,835, which she declared was insufficient to meet her children's and her personal expenses. With regard to her own attorney fees, Blake (who was represented by three attorneys from one firm and another attorney in solo practice) stated that through June 2018 she had paid her attorneys a total of $180,561.50.

In his reply, Langer indicated that, as of June 30, 2018, he had paid $25,000 to his attorneys and owed an additional $89,181. Langer also noted that Blake failed to declare the fees and costs she had paid to her forensic accountants, and indicated that the records he obtained showed that Blake had paid them $9,555 and owed them an additional $11,393.75 as of June 12, 2018.

At the July 30, 2018 hearing, the family court gave a warning to Langer that he was expected to become self-supporting as provided for

---

[4] For example, in 2016, ProSocial had a net income of $309,873; in 2017, its net income was $565,878.

in Family Code[5] section 4320, and ordered that he undergo a vocational exam. The court also noted that, based upon information from the therapist for the couple's children (which information is not included in the record), there was a need for reunification therapy with regard to the older child, Max, who refused to see his father. Therefore, the court ordered that father and Max participate in reunification therapy with therapist Dr. Renee Cohen. The court also ordered that Langer have visitation with the younger child, Henry, for three hours twice a week. Turning to the issue of attorney fees and spousal support, counsel for the parties agreed that the only significant assets the parties had were the equity in the family home and their retirement accounts. After hearing from counsel, the court ordered the parties to apply for a $350,000 line of credit on the family home; out of those funds, the court ordered that $125,000 be paid to Langer's attorneys and $90,000 be paid to Blake's attorneys, and that Langer receive $30,000 as an advance on his share of the community property, subject to recharacterization and reallocation.

Following the hearing, Blake and Langer applied for the home equity line of credit with two different banks. In her applications, Blake did not list her income on the application form, and instead attached her I&E from the dissolution action, which indicated that she had a negative income of $44,244 in June 2018 (although it showed an average positive monthly income of $21,236 over the previous 12 months). Both applications were rejected. Because of this, Langer had

---

[5]     Further statutory references are to the Family Code.

to withdraw an additional $100,000 from his retirement account (which would be subject to taxes and penalties if he did not repay the account within 60 days), and charged $40,000 to pay his attorney fees, accounting fees, credit card bills, and rent.

B.    *Issues Regarding the Ordered Reunification Therapy*

In late August 2018,  Blake and Langer, and their respective attorneys, signed a stipulation regarding the ordered reunification therapy in which Blake and Langer agreed that (1) they and Max would participate in as many sessions of counseling as Dr. Cohen determined was needed; (2) they would cooperate by, among other things, exercising parental authority to require that Max attend and cooperate with treatment; (3) Blake would participate in the reunification therapy; (4) Dr. Cohen could communicate with Max's current therapist (Dr. Elisha Goldstein) and former therapist (Lisa Hwang-Kim, who also treated Max's brother Henry); and (5) Blake and Langer each would pay one-half of Dr. Cohen's fees, subject to reallocation.

Problems emerged almost immediately.  It appears that, by September 5, 2018, Dr. Cohen had asked that Max stop seeing his other therapist, Dr. Goldstein, while she was working with him on his reunification therapy, but Blake refused her request.  Blake also refused to respond to a request to grant permission to Hwang-Kim to speak to Dr. Cohen regarding Max and Henry.[6]  By September 22, 2018

---

[6]    Blake's attorney acknowledged that Dr. Cohen could speak to Hwang-Kim about Max, but would not respond when asked if Blake consented to Hwang-Kim speaking to Dr. Cohen about Henry.

10

(a week before Dr. Cohen had scheduled the first joint session with Max and Langer), Max was refusing to go to any more sessions with Dr. Cohen, and Blake declined to make herself available to meet with Dr. Cohen and Langer to discuss the situation.

On September 18, 2018, Blake's father, Steven Wohl (who is an attorney in New York), sent a letter on his professional letterhead to Dr. Cohen, with copies to the family court judge, Blake, and Langer, saying that he was "deeply troubled by the emotional distress [Max] is suffering due to his meetings with [Dr. Cohen]." Wohl relayed some things Max purportedly told him about the sessions, offered his opinion regarding what was the scope of her engagement under the family court's order and how some of her directions (such as asking to meet with Henry) went beyond that scope, accused her of committing malpractice, and questioned the efficacy of reunification therapy. He ended the letter by stating that he was not threatening any kind of action, "[b]ut my expectation is that ***you will henceforth do whatever is necessary*** to alleviate this situation with Max (including recusing yourself) and that you will also refrain from reprising it as to Henry."[7] (All emphasis in original.)

Dr. Cohen forwarded Wohl's letter to counsel for Blake and Langer, calling it "inappropriate" and expressing her concern that Wohl

---

[7] Shortly after Wohl sent this letter, he contacted Langer directly, sending him a proposed (somewhat one-sided) framework for settlement of the dissolution action, urging Langer to agree to use the framework to begin settlement negotiations but insisting that Langer not involve his attorney.

was "inserting himself into this process." She said that she was worried that Max was being "interrogated" after his sessions with her, noting that whatever gains he achieved from each session were *"notably undone"* when he returned for his next session. She acknowledged that Max would leave his sessions upset, but explained that is not unusual because "Max has been empowered to believe he does not have to see his father." Finally, Dr. Cohen noted that Blake had failed to pay her share of Dr. Cohen's retainer, despite Dr. Cohen having granted Blake's request for an extension of time to pay it, and concluded that Blake did not appear to prioritize or support the reunification therapy.

C.    *Events Leading Up To the December 2018 Fee Award*

On September 27, 2018, Langer brought an ex parte RFO asking that, among other things, Wohl be enjoined from contacting Max and/or Henry, that Blake and Wohl be enjoined from interfering in the reunification process, and that Blake be ordered to transfer funds from her retirement accounts to Langer's retirement account to repay the funds he withdrew due to the failure to obtain the court-ordered home equity line of credit. The family court set the matter for hearing on October 19, 2018, ordered Dr. Cohen to appear at the hearing and to provide a written progress report, and set forth a schedule for further briefing. The court also appointed minors' counsel for Max and Henry and ordered that minors' counsel's fees and costs were to be paid by Blake, subject to reimbursement and reallocation. Finally, the court advised the parties it was contemplating an order for the sale of the

12

family residence if necessary to fund the costs of counsel and expenses of the case.

It appears that Blake filed an opposition to the ex parte RFO that included some information regarding her financial situation, but it is not included in the record on appeal. Langer filed a reply, which is included in the respondent's appendix, in which he produced evidence showing that ProSocial had received income that had not been accounted for when Blake's accountant estimated the company's projected income for 2018. He also produced evidence that Blake had taken some significant draws from the ProSocial bank account. Finally, he submitted evidence showing that in the three months after the July 30, 2018 hearing, Blake made a total of $162,810.37 in payments to her attorneys. He noted that, with the payments she made before the July 30, 2018 hearing (as set forth in her I&E filed at that time), she had thus far paid a total of $343,371.87 in attorney fees. Langer presented evidence that he had paid his attorney a total of $125,322, and still owed approximately $100,000 in additional fees.

At the October 19, 2018 hearing, minors' counsel reported that the extreme conflict between Blake and Langer was causing both children to suffer, particularly Max, who suffers from extreme anxiety that manifests as OCD. Counsel also reported that after working many hours with Dr. Cohen and Hwang-Kim, they had developed a good therapeutic plan, but that Dr. Cohen recused herself from the case the morning of the hearing. After holding an unreported conference in chambers, the court ordered minors' counsel to select a new reunification therapist and, based upon minors' counsel's

13

recommendation, the court modified its previous visitation order to increase father's visitation with Henry. The court also modified the Stipulation to provide that Blake and Langer have joint legal custody of the children.

The family court also ordered the parties to attend a mediation with a retired judge on November 19, 2018, and ordered the parties' accountants to meet and confer before that mediation to discuss the value of ProSocial, the funds available for support, and the tracing of any use of community funds. If the parties did not reach an agreement at the mediation, the court ordered that their accountants provide it with a side by side analysis of the issues discussed at the meet and confer.

The court set a telephonic hearing for October 24, 2018 to address issues raised in the ex parte RFO regarding Langer's withdrawals from his retirement account and his request that Blake transfer funds from her retirement accounts to pay back those funds, as well as Langer's request for an award of accountant fees. The court ordered both parties to file updated I&Es before the hearing, and ordered Blake to provide a declaration explaining her use of funds from ProSocial from April 2018 to the present before the hearing.

Blake and Langer filed their respective I&Es on October 24, 2018.[8] We do not know if Blake complied with the court's order to

---

[8] Blake did not include these I&Es in her appellant's appendix, even though she is challenging the subsequent award of attorney fees. Langer included them in his respondent's appendix.

14

provide a declaration regarding her use of funds from ProSocial, because no such document is in the record on appeal; we assume she did so. (*Jameson v. Desta, supra,* 5 Cal.5th at p. 609.)

Blake reported that she had $102,941 in income the previous month (which she stated was due to a discretionary and variable grant ProSocial received that month), with an average monthly income of $14,358 during the previous 12 months; her monthly expenses were $30,274. She also reported having $8,517 in checking accounts, $622,144 in retirement accounts in her name, plus the family residence and her car. Finally, she reported she had paid $349,172 in attorney fees, and still owed $56,261 to her attorneys.

Langer reported he had no income during the previous month, and an average monthly income of $115 from private coaching for youths in soccer and basketball; his monthly expenses were $3,585. He also reported he had $6,274.16 in cash and/or bank accounts; the remainder of his assets appear to consist of his community property interest in the family residence and retirement accounts (including Blake's accounts). Finally, he reported he had paid $125,322 in attorney fees, and owed his attorneys more than $100,000. Langer also filed a declaration in which he stated that he participated in a vocational exam with Blake's expert, Lynne Tracy, and provided evidence regarding his job search efforts.

At the hearing on October 24, 2018, the court heard testimony from the forensic accountants for each party. Both accountants (and counsel) referred to reports that were before the court but do not appear

to be in the record on appeal.[9]  It appears (based upon counsel's discussion) that the report from Langer's forensic accountant shows that, in the previous six months, Blake had taken $193,427 from ProSocial's account and put it into her Fidelity account, and that she had access to an additional $155,361 in her nonretirement Fidelity account.  Although Blake's forensic accountant disputed some of the items in Langer's accountant's report (which criticisms Langer's accountant addressed and contested), we cannot determine how her criticisms affect the accuracy of counsel's discussions of Blake's use of ProSocial's funds, or any other matter discussed, because the reports are not before us.

Following the hearing, the family court issued a minute order that set forth a lengthy summary of the background of the case, including the various orders that had been made.  The court concluded, after hearing from the parties and their accountants on the record and considering their written submissions, that it did not have the authority to grant Langer's request to order Blake to rollover funds from her retirement account to Langer's retirement account.  However, the court granted Langer's request for accountant's fees, and ordered Blake to pay $20,000 to Langer's forensic accountant, subject to reallocation and reimbursement.  In making the order, the court found "the required

---

[9]    At one point in the hearing, the court told the parties, "by the way, I do need the parties, since we are on the record, everything that has been provided to the court should make its way into the record so that to the extent there are any proceedings outside of this court, that we have a full and accurate record."

16

disparity in income and an ability to pay, and that the forensic accounting fees are reasonable under the circumstances." The court continued the hearing on the remaining issues in the ex parte RFO to December 11, 2018, to be heard with Langer's other pending RFOs, including his request for attorney and accountant fees.

D.    *The December Fee Award*

In advance of the December 11, 2018 hearing, Blake filed an updated I&E, and both parties filed supplemental briefing and declarations from themselves and their forensic accountants.[10] In her I&E, Blake reported she had negative income of $1,401 in October 2018, and that her monthly income over the 12 months ending on October 31, 2018 was $16,398. She estimated that Langer had a monthly income of $14,583 based upon Lynne Tracy's vocational exam. She reported $9,707 in cash and bank accounts, and $2,900,641 in real estate and personal property, which included $620,640 in her retirement accounts (but did not include the children's education accounts or ProSocial's business value). She also reported $30,274 in monthly expenses, and listed more than $120,000 in loans and more than $50,000 in credit card debt. Blake attached to her I&E a profit and loss statement for ProSocial, showing a net profit of $90,448.67 for the period from

---

[10]    Although Blake challenges the attorney fee order made at the December 11, 2018 hearing, she did not include in her appellant's appendix many of the documents that were submitted for that hearing, such as her updated I&E, her supplemental opposition (with declarations) in opposition to Langer's RFO, and the exhibits that were attached to the supplemental declarations Langer submitted in support of his RFO.

17

November 2017 to October 2018, and a net loss of $35,548.16 for the month of October 2018; the company's expenses for the year included $54,000 to Blake's retirement plan.  Finally, Blake reported she had paid $372,081 to her attorneys, and still owed them approximately $133,000.

In a supplemental declaration filed in opposition to Langer's request for spousal support, child support, and attorney fees and costs, Blake provided details regarding ProSocial's declining business and her personal finances, among other issues.  Blake also submitted the declaration of one of her attorneys, who described, among other things, Lynne Tracy's conclusions from her vocational examination of Langer (the report from which is attached as an exhibit to the declaration),[11] and listing Langer's counsel's extensive (and, in his view, unreasonable) discovery requests and six RFOs filed thus far.

Blake also submitted the declaration of her forensic accountant, Tracy Katz, who provided information regarding, among other things, Blake's monthly base gross cash flow, and the accountant fees Blake had incurred and was expected to incur.  Katz stated that, as of November 15, 2018, Blake had incurred a total of $105,678 in accounting fees and costs, more than $50,000 of which was for work related to discovery, document production, and maintenance of a digital

[11]    Tracy concluded that Langer was taking appropriate steps to gain employment (although he did not mount an active and targeted job search until late 2017 or early  2018), that he remained employable, and that his annual earning capacity would be anywhere from $127,000 to $206,000 in base salary, depending upon the size of the company and the level of management into which he was hired.

document database. Katz noted that Blake had a balance due of $35,296 for work completed through November 15, 2018, and estimated there would be an additional $75,000 in fees to complete the work necessary to bring the case to resolution.

Langer did not submit an updated I&E before the December 11, 2018 hearing. Instead, he submitted supplemental briefing and declarations from himself and his forensic accountant, Jeremy Salvador. In his own declaration, Langer described his efforts to secure employment, along with other matters. Salvador in his declaration included information, based upon his review of various records, regarding Blake's and Langer's available income, the legal and accounting fees paid by each party, Blake's use of funds from ProSocial and her personal accounts, the amount of accounting fees incurred by Langer thus far ($80,568, of which Langer had paid $38,500) and expected to incurred in the future (between $24,000 and $58,000), and the source of funds available to pay attorney and accounting fees.

On December 11, 2018, the family court held a hearing to consider Langer's RFO (filed March 19, 2018) to set aside the Stipulation, Langer's RFO (filed May 21, 2018) seeking joint physical and legal custody of Henry and Max, and Langer's RFO (filed May 21, 2018) seeking spousal and child support and an award of professional fees and costs. After hearing testimony from Langer, Blake, the forensic accountants, and Lynne Tracy, as well as arguments of counsel (including minors' counsel), the court took the matters under submission. The next day, the court issued a detailed order. The court denied the RFO to set aside the Stipulation, although the court

19

modified it to suspend Langer's child support obligation under the Stipulation as of the filing of the RFO. With regard to Langer's request for legal and physical custody of both children, the court affirmed its prior order awarding joint legal custody, and adopted the recommendation of minors' counsel to increase Langer's visitation with Henry.

Turning to the support and fee RFO, the court awarded Langer $100,000 towards his professional fees and costs, to be taken from Blake's share of the proceeds from the sale of the family residence. It explained: "In part because she was and is employed and Mr. Langer is not, and in part because of the Stipulation, Ms. Blake has been able to significantly outspend Mr. Langer in terms of professional representation in these proceedings. . . . The point of the fee statues in the Family Code is to enable full and fair representation for both sides. And that is certainly made more difficult when one party has freer or better access to funds, as Ms. Blake did here. [¶] That having been said, Mr. Langer has been ably represented by fine and competent counsel and has not been harmed in terms of outcomes before this Court or prior bench officers. If anything, as Ms. Blake's counsel urges, perhaps he has been too well represented given the number of subpoenas Mr. Langer's counsel has issued and requests for relief he has filed." The court found "the required disparity in income and ability to pay, as well as the reasonable need for fees on Mr. Langer's part." The court declined to award spousal support on the grounds that Blake did not have the ability to pay it, and because each side would be

20

receiving a seven figure distribution from the sale of the family residence.

E.     *Events Leading to Langer's Request for Joinder*

In February 2012, the Meredith Blake Irrevocable Trust (the 2012 Blake trust) was created, with Meredith Blake as Grantor, and Langer and Daniel S. Wohl (Blake's brother) as trustees. The trust was drafted by Steven Wohl, Blake's father, who is a trusts and estates attorney.[12] Langer and Daniel, as trustees of the trust, took out a $2 million term life insurance policy on Blake (the Blake policy) with MetLife Investors USA Insurance Company (MetLife), which is administered through Brighthouse Life Insurance Company (Brighthouse); the trustees are beneficiaries of the Blake policy.[13]

Shortly after being retained in January 2018, Langer's counsel wrote to MetLife, instructing it to maintain until further notice the named beneficiaries or covered dependents under any policy it had issued to either Langer or Blake. In August 2018, Steven wrote to Brighthouse, enclosing forms assigning the Blake policy to Steven as trustee of The Blake Issue Irrevocable 2018 Trust (the 2018 Blake

---

[12]     For the remainder of this opinion we will refer to Daniel Wohl and Steven Wohl by their first names to avoid confusion.

[13]     A similar trust was created with Langer as grantor and Blake and Daniel as trustees.

21

trust).[14]  Steven had created the 2018 Blake trust in April 2018, with Steven as both grantor and trustee.[15]

In February 2019, Steven wrote a letter to MetLife and Brighthouse, representing that he was the attorney for Daniel in his capacity of trustee of the "former" 2012 Blake trust.  He stated that he recently learned that MetLife/Brighthouse had failed or refused to implement the assignment Steven had sent to Brighthouse in August 2018, due to the letter Langer's counsel sent to MetLife in January 2018.  Steven asserted that Daniel, as trustee of the 2012 Blake trust and therefore owner of the Blake policy, was the owner of the Blake policy and, under New York and California law, was free to assign and/or change the beneficiary of that policy.  Steven warned that if he did not receive written confirmation that the assignment he submitted in August 2018 was recorded on their records, "I will have to pursue legal remedies."  Steven sent a copy of his letter to Langer's counsel.

It appears that Langer's counsel contacted MetLife and/or Brighthouse after receiving Steven's letter and provided case law to support Langer's position that the Blake policy could not be assigned to the 2018 Blake trust.  On March 5, 2019, Steven sent an email to a

---

[14]    We note that in December 2017, Blake signed a third party designation form as the owner of the Blake policy, designating Steven to receive duplicates of notices regarding the policy.

[15]    It appears that Daniel, as trustee of the 2012 Blake trust, caused the Blake policy to be assigned to the 2018 Blake trust.  Blake stated that she "did not ask" her father to create the 2018 Blake trust, and "did not ask" her brother to assign the Blake policy.

22

representative of MetLife, explaining why the cases Langer's attorney cited did not apply, and again threatening legal action if MetLife continued to refuse to implement the assignment. In sending the email (which he also sent to Langer's attorney), Steven inadvertently included an email he had sent to Blake in November 2018. In that email, Steven wrote, "I have reviewed [your residence trust] and believe I have a method of indefinitely tying your house up in litigation against [Langer], IN NEW YORK." He then laid out his plan, in which Blake would transfer a separate property interest in the house from Blake and Langer's residence trust to Steven as trustee of a new trust she would create in New York, and then Steven as trustee would bring an action in New York against Blake and Langer as trustees of the residence trust. He concluded, "My action may well not succeed, but it would have a very good chance of tying up your house for years—and deterring any would-be buyer who would be offput 100% from buying a house in litigation, especially in NY."

On March 13, 2019, Langer filed an ex parte RFO, asking the family court to (1) grant Langer's motion for joinder of Daniel, Steven, and the 2012 Blake trust; (2) enjoin Steven and Daniel from contacting Brighthouse or attempting to modify and/or transfer the Blake policy; (3) enjoin Steven and Daniel from attempting to transfer any portion of the family residence into a subsequent trust and/or interfering with the sale of the residence; (4) enjoin Brighthouse from transferring ownership of or modifying the Blake policy, or from taking any direction from Steven and/or Daniel regarding that policy; (5) grant Langer's motion for joinder of Brighthouse; (6) make an order prohibiting the

23

transfer of ownership or modification of the Blake policy; (7) make an order prohibiting the modification or change of beneficiary designation for the Blake policy; and (8) order Blake and the children not to be present during potential buyer walk-throughs and/or open houses for the family residence, and that Blake maintain the residence in a neat and orderly fashion presentable for showing to prospective buyers.

In his memorandum of points and authorities, Langer explained that the family court had the authority to immediately issue temporary restraining orders enjoining Daniel, Steven, and Brighthouse. He also explained that he sought joinder of Daniel, Steven, and Brighthouse to prevent the transfer or modification of the beneficiary designation of the Blake policy before final disposition of the community assets, and also sought joinder of Steven to prevent him from interfering with any community assets, the reunification therapy for Max and Langer, or Langer's relationship with his children. He argued joinder was necessary to enforce any injunctive orders issued and to ensure that any judgment rendered on property issues would be enforceable against parties claiming any interest in the community assets. Finally, he stated that he intended to file his complaint alleging breach of trust/fiduciary duty, conspiracy, fraudulent transfer, breach of contract, fraud, inducing breach of contract, interference with contract, and aiding and abetting breach of trust by a trustee. He concluded: "Since [Daniel and Steven] are acting as agents of, and in concert with [Blake] and for her benefit against [Langer], and the issues involve matters

24

before the Family Law Court, as well as assets subject to the jurisdiction of the Family Law Court, joinder is appropriate."[16]

Blake opposed Langer's request for immediate injunction orders, arguing that (1) the Blake policy was not an asset because it was a term policy (and therefore had no cash surrender value), and therefore it was not a community asset; (2) the 2012 Blake trust, and not Blake, was the owner of the policy; and (3) the Blake policy was not community property because the premium for the past term was paid with Blake's separate property. Blake also argued that joinder was inappropriate and unnecessary because neither she nor Langer nor the community had an ownership interest in the Blake policy, and Langer's other arguments regarding the family residence and Steven's purported interference with regard to Max were speculative. Finally, Blake asserted that Langer's motion for joinder was procedurally deficient because Langer failed to use the mandatory form for his motion and failed to provide the proposed complaint.[17]

The family court held an evidentiary hearing on Langer's ex parte RFO on April 10, 2019, at which Blake, Langer, and the real estate broker testified. After hearing that testimony and arguments of

---

[16]    In addition to submitting evidence to support his request for joinder, Langer also submitted evidence regarding the court-appointed real estate broker's efforts to sell the family residence and Blake's purported failure to properly maintain the house or to keep it neat and orderly for showings to prospective buyers.

[17]    Blake also disputed Langer's assertion that she was not properly maintaining the family residence or was interfering in the broker's efforts to sell the house.

25

counsel, the court made several orders to facilitate the sale of the family residence (including granting the broker authority to make decisions and ordering that any offer above a specific amount shall be deemed accepted). The court also ordered that Blake "and any one acting in concert with her, including but not limited to her brother and father," were temporarily prohibited from engaging in any transfers, changes, or amendments of the 2012 Blake trust or the Blake policy. The court then continued the ex parte RFO for a further hearing to May 1, 2019.

On May 1, 2019, before the further hearing, Langer lodged a citation issued by the State of New York stating that a petition had been filed by Daniel and Steven. The citation stated that Daniel and Steven sought various declarations and orders regarding the Blake policy, and sought $10,000 in sanctions, jointly and severally, against Langer and the law firm and two of the lawyers representing him in the dissolution action, and $100,000 in punitive damages against his primary attorney, Elyse Margolin.

At the start of the hearing (after hearing a short report on the progress towards selling the family residence), the family court informed the parties that it was issuing its own order to show cause (OSC) whether to augment its prior fee award under section 2030, subdivision (c). The court expressed its displeasure with what was happening in the case, saying: "I am picking the dates [for the hearing on the OSC]. The opportunities for courtesy in this case are now gone. I told you at the last hearing I was going to take control of the case. [¶] Since that time, the case has done nothing but spin out of control in ways that are so far from compliance with Family Code 271 that I am

frankly shocked." The court then stated that "[t]he ex parte brought by Mr. Langer is granted in all respects as it relates to the insurance."

The court told Langer's attorney it was going to need "the entirety of your fees and costs . . . to date," and what had been paid thus far, and said that it needed her redacted billing statements because it was "required to do a granular review."[18] The court also asked Langer's attorney to research whether it could grant attorney fees under section 271 for work done in connection with the New York case Steven and Daniel filed, "because if I can, I will because I am extraordinarily concerned."

After discussing dates for the submissions and the OSC, the court stated: "The attorneys will be paid, and then [Steven] can try to figure out whether or not it was worth $500,000 in legal fees to file an action in the state of New York against [Langer's] counsel over a nonissue[19] already pending before this court and upon the heels of an email [from Steven] to [Blake] suggesting a way to subvert the court process. [¶] That is so far from Family Code section 271 compliant behavior that it's quite concerning, and I intend to issue an attorney fee award that will be considered a family support obligation within the meaning of the Bankruptcy Code so that it will not be dischargeable."

---

[18] The court made the same request of Blake's counsel as well, saying it also intended to issue an award to Blake's attorneys.

[19] The court believed the identity of the beneficiaries of the Blake policy was a nonissue because it was unlikely that any claim will be made on the policy before the divorce is final, since there was no indication Blake was at risk of dying in the near future.

The court then reiterated its ruling, but this time it simply stated, "The ex parte is granted in full." It set a hearing on its OSC for May 29, 2019 and, in setting a date for the attorneys to file declarations regarding their fees and costs, the court noted, "I don't really need the *Keech*[20] declaration since I have lived through this, but I do need the amount of fees from [each counsel, including minors' counsel]."

Before the court ended the hearing, minors' counsel indicated she had a pressing concern she needed to discuss with the court. She informed the court that she had visited with Max the previous day, and he had changed dramatically since her visit three or four months earlier. She said that he was extremely agitated, hostile, and out of control. She made several suggestions about what needed to be done to help him, which the court adopted in its order.

In its minute order from the hearing, the court stated: "The Court grants the relief sought in [Langer's] ex parte application starting at Section 8a through 8j. The relief sought in 8k is denied." In other words, the court did not limit its grant of relief to issues regarding the Blake policy; it granted all the relief Langer sought, including his motion for joinder, except for Langer's request that the court order Blake and the children to not be present during potential buyer walk-throughs and/or open houses, and that Blake properly maintain the family residence.

Langer filed the joinder complaint on May 17, 2019, naming Daniel and Steven as claimants. The complaint alleged claims for

---

[20] *In re Marriage of Keech* (1999) 75 Cal.App.4th 860.

28

(1) failure to comply with Probate Code section 15403; (2) conversion; (3) breach of fiduciary duty; (4) wrongful use of civil proceedings; (5) conspiracy; (6) ongoing conspiracy; and (7) intentional infliction of emotional distress. The first, second, and third causes of action relate solely to the attempted transfer of the Blake policy from the 2012 Blake trust. The remaining causes of action allege damages arising from Daniel and Steven's filing of the New York lawsuit (the fourth cause of action), and their attempts to interfere in the marital dissolution action and/or to continue the alienation of Max from Langer (the fifth, sixth, and seventh causes of action). There is no proof of service attached to the complaint in the appellant's appendix; it appears that it was not served on Blake's counsel until the end of the hearing on the court's OSC on May 29, 2019.[21]

F.    *The June 2019 Fee Award*

In response to the family court's OSC, all counsel submitted their billing statements for their work since the beginning of the case.[22] According to Langer's counsel, Langer had paid a total of $125,219.49 in attorney fees and costs, and owed an additional $211,222.29, for a total

---

[21]    Blake has filed a request for this court to take judicial notice of the proof of service of the joinder complaint, which was filed on June 18, 2019, indicating that the complaint was served on Blake's counsel at approximately 3:30 p.m. on May 29, 2019. We grant that request.

[22]    Blake included in her appellant's appendix Langer's counsel's declaration, but did not include the exhibits attached thereto, including the billing statements.

of $336,441.78 in fees incurred.[23]  Counsel also stated that she, her associate, and her law firm had retained an attorney in New York to represent them in the New York case, and that attorney requested a $25,000 retainer due to the complexity of the case.  She also stated that, because she, her firm, and her associate were ethically bound to have separate counsel to represent their own interests, Langer had to retain his own counsel, who requires a $20,000 retainer, to represent him in the New York case.

According to Blake's attorneys, Blake had incurred $176,524 in fees and costs with respect to co-counsel Lori A. Loo, and $304,136.39 with respect to lead attorneys Summers Levine & Kretzmer (who began representing Blake in September 2018).  Blake had made payments totaling $143,001 to Loo, and $15,000 to Summers Levine & Kretzmer, and owed $33,523 to Loo, and $271,240.89 (plus an additional $17,895.50 for work in progress) to Summers Levine & Kretzmer.  These fees that Blake incurred—a total of $480,660.39—were in addition to the $201,171 in fees and costs that she had paid to her former lead counsel, Brot & Gross.  Thus, in total, Blake had incurred $681,831.39 in attorney fees and costs, and had paid $359,172 toward that amount.

---

[23]  Langer's forensic accountant also submitted a declaration stating that he and his firm had billed for a total of $104,534 in fees, had been paid $38,500, and were owed $67,309; he attached copies of the firm's detailed invoices, although Blake did not include those invoices in her appellant's appendix.

The court held a lengthy hearing on its OSC and other pending issues. At the end of the hearing, Blake's counsel asked the court whether it was going to grant Langer's request for joinder. The court stated that it had already granted that request at the last hearing. Counsel noted that Blake had not yet been served with the joinder complaint, and had been denied due process because she was not given notice of exactly what would be included in the complaint. Counsel immediately was served with a copy, and the court said it would consider counsel's argument. The court took all matters under submission, and issued a very detailed minute order on June 4, 2019.

In the minute order, the court began by summarizing the background for the OSC, noting that the court set its own OSC regarding fee augmentation "because a central tenet of the Family Code, the ability of the lower earning spouse to have adequate legal representation, is not being accomplished here." The court then issued its rulings.

Addressing the OSC regarding fee augmentation, the court rejected Blake's assertion that it lacked authority to augment fees on its own OSC, stating that "'[t]he vicissitudes of family law proceedings dictate that trial judges must have maximum flexibility in ensuring that each party has the means to pay for counsel. To hold otherwise would frustrate those policies.'" (Quoting *In re Marriage of Hobdy* (2004) 123 Cal.App.4th 360, 371 (*Hobdy*).) The court noted it previously had made two fee awards to Langer's counsel, but those awards had not been effectuated. Instead, the court observed that Steven "is apparently putting into action [Blake's] prior threats to [Langer] to

31

grind him down by out litigating him." The court explained that the court's issuance of its own OSC "merely . . . reflects this Court's obligation to effectuate Section 2030 and is therefore proper under the circumstances." The court then ordered Blake to pay minors' counsel $17,200, subject to claims of reimbursement and reallocation. It also ordered Blake to pay $200,000 to Langer's counsel and $100,000 to her own counsel within four weeks of the order, with both payments to be paid from the community property portion of Blake's retirement account. The court also ordered that the award to Langer's attorney would increase to $300,000 if the New York lawsuit filed by Steven and Daniel remained pending in four weeks.[24] The court stated that the additional $100,000 award would not be subject to reallocation and reimbursement, but the other awards were. Finally, the court stated that it "makes the necessary findings of disparity in access to funds and income and ability to pay, as well as the reasonable need for fees and augmentation of prior awards."

The court next addressed issues regarding joinder. It declined Blake's request to reconsider its May 1, 2019 ruling granting Langer's ex parte application. It also rejected Blake's assertion that Langer's application did not comply with rule 5.24 of the California Rules of Court because it did not include a separate pleading. The court stated: "That argument rings hollow. [Blake's] father (after emailing her a plan to intentionally and inappropriately delay the sale of the

---

[24]    The court justified this award of fees by finding that the New York action was a related matter to the present action.

32

community residence) has filed a manufactured lawsuit over a non-material issue against [Langer] and his counsel in New York. [Langer] and his counsel reacted appropriately under the circumstances. And any prejudice from the lack of a separate pleading is of no moment. [Blake] can hardly complain when her father sues [Langer] and his counsel in New York and [Langer] then seeks joinder here on the same issue. [Blake] is well aware of the issues involved. And all those issues should be resolved in this Court, as they are related to the pending dissolution action and the implementation of this Court's [automatic temporary restraining orders]." The court ordered that once the joinder complaint was served, all further proceedings in the joinder matter would be stayed, provided that the joined parties agreed to comply with the interim orders of the court.

Blake timely filed notices of appeal from the December 2018 order awarding fees, the order granting Langer's ex parte request for joinder, and the June 2019 order awarding fees.

## DISCUSSION

A. *The Attorney Fee Orders*

We begin with Blake's appeals from two orders awarding Langer attorney fees: the December 12, 2018 order awarding Langer $100,000 from Blake's share of the proceeds from the sale of the family residence (the December fee order), and the June 4, 2019 order directing Blake to pay, from the community portion of her retirement account, $200,000 to Langer's counsel (plus an additional $100,000 if the New York action

33

remained pending in four weeks) and $100,000 to her own counsel (the June 2019 fee order).

Sections 2030 and 2032 govern the award of need-based attorney fees and costs in marriage dissolution proceedings. Section 2030, subdivision (a)(1) requires the court to "ensure that each party has access to legal representation . . . to preserve each party's rights by ordering, if necessary based on . . . income and needs assessments, one party . . . to pay" the other party's reasonable attorney fees and costs. The statute "reflects the public policy of providing, """. . . consistent with the financial circumstances of the parties, a parity between spouses in their ability to obtain effective legal representation.""""" (*In re Marriage of Sharples* (2014) 223 Cal.App.4th 160, 164 (*Sharples*).)

"In ruling on a request for fees and costs under section 2030, the court is guided by section 2032, which provides that an award of fees and costs under section 2030 may be made 'where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties.'" (*Sharples*, *supra*, 223 Cal.App.4th at pp. 164-165, quoting § 2032, subd. (a).) Under section 2032, subdivision (b), the court, in determining what is just and reasonable, must "take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320."

"Section 4320 presents a near-exhaustive list of factors that are to go into a spousal support award . . . . To be sure, not all section 4320

factors will be relevant all the time (hence the 'to the extent relevant' language in § 2032). But obviously a number of section 4320 factors will *usually* bear on a [need-based attorney] fee order. These surely include earning capacity (subd. (a)); ability to pay, taking into account such things as assets and standard of living (subd. (c)); respective needs (subd, (d)); obligations and assets (subd. (e)); age and health (subd. (h)); and the overall balance of hardships (subd. (k))." (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 253.) In addition to those factors, the court may also consider the parties' trial tactics. (*Sharples*, *supra*, 223 Cal.App.4th at p. 165; *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 974-975; *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 662.)

While the court has discretion in ruling on a request for attorney fees, section 2030, subdivision (a)(2) requires that the court make three specific findings to support its ruling: "whether an award of attorney's fees and costs . . . is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties." (§ 2030, subd. (a)(2); see *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1050 (*Morton*).) Those findings must be explicit; that is, they must be "stated in words, either in writing or orally on the record." (*Morton*, at p. 1050.) We review the court's award of attorney fees under section 2030 under an abuse of discretion standard.

### 1.     *The December 2018 Fee Order*

Blake contends the family court committed prejudicial error by awarding attorney fees to Langer in its December 2018 fee order because at the time it made the order, the court did not have current information regarding the amount of fees Langer had incurred and "'currently owed,'" and therefore it could not assess whether the "'requested fees and costs are just, necessary, and reasonable.'" (Citing Cal. Rules of Court, rule 5.427, hereafter Rule 5.427.) She also contends the court abused its discretion by failing to account for the fact that Langer "may have engaged in over-litigation." We disagree.

Blake is correct that the family court must have current information when determining whether to award attorney fees to a party under section 2030. (See, e.g., Rule 5.427(d).) It also is true, as she asserts, that the court cannot award attorney fees "[w]ithout ascertaining whether or at what hourly rate the work for which reimbursement was sought was actually done, much less that the work was 'reasonably necessary' in light of the issues in the case." (*In re Marriage of Keech*, *supra*, 75 Cal.App.4th at p. 869 (*Keech*).) Where Blake's argument fails is in her assertion that the family court did not have the necessary information before it when it made the December 2018 fee order.

First, when Langer made his earlier request for attorney fees, in May 2018, he submitted the declaration of his attorney, who provided the hourly rates for each attorney who would be working on the case, the amount of fees that had been incurred up to that point (approximately $50,000) and the tasks for which those fees were

36

incurred, *and a detailed list of tasks she expected would need to be performed in the future*, for which she estimated no less than $100,000 in fees would be incurred. Based upon this information, as well as information regarding both parties' income, expenses, and ability to pay, on July 30, 2018, the family court awarded fees in the amount of $125,000 to Langer's attorney. In other words, the court determined—based upon the detailed information Langer had submitted—that, as of July 30, 2018, such an award was both reasonable and necessary. However, that award was never effectuated because Blake and Langer were unable to obtain a home equity line of credit (no doubt due in part to Blake's submission of her I&E showing she had negative income of more than $40,000 in June 2018).

Second, Langer had submitted an updated I&E in October 2018,[25] which was signed by both him (under penalty of perjury) and his attorney, in which he stated that he currently owed in excess of $100,000 in attorney fees and costs. And although Langer did not submit his attorney's invoices for work that had been performed after his previous request for attorney fees, his attorney submitted a declaration with his current request, signed on September 26, 2018, in which she described some of the work she (or members of her firm) had performed since the July 30, 2018 order.

---

[25] An I&E is deemed to be "current" if it was completed within the three months prior to the hearing on a request for attorney fees. (Cal. Rules of Court, rule 5.427(d)(1).)

Third, Langer's voluminous submissions to the court between May 2018 (when his previous request for fees was filed) and the December 2018 order awarding attorney fees evidenced an extensive amount of work performed by Langer's counsel on complex and sometimes novel issues. For example, there were numerous issues that arose regarding custody and Max's participation in reunification therapy that necessitated the involvement of the attorneys for both sides due to the parties' inability to communicate with each other. Langer's attorney also was required to respond to Steven's efforts to interject himself into the proceedings by writing a threatening letter to the court-ordered reunification therapist and contacting Langer directly in an attempt to push him to agree to a settlement of the dissolution action. In addition, in light of Blake's assertion that she had negative income from ProSocial, Langer's attorney was required to conduct extensive discovery for records to allow her to trace where ProSocial's revenue was going.

Thus, the following evidence was before the court: (1) Langer's submission in May 2018 of the tasks his attorney believed would need to be performed, many of which the attorney told the court at the December 11, 2018 hearing still needed to be performed; (2) Langer's attorney's September 26, 2018 declaration describing some of the work that had been done since the prior fee request (and the evidence of that work shown in Langer's submissions); and (3) Langer's sworn statement (attested to by his attorney) that he owed his attorney in excess of $100,000. From this evidence, we conclude the family court had sufficient information before it in December 2018 to determine that

38

Langer had incurred at least $100,000 in fees for the work his attorney had performed. As the court in *Keech* aptly observed, "'when the trial court is informed of the extent and nature of the services rendered, it may rely on its own experience and knowledge in determining their reasonable value.'" (*Keech, supra,* 75 Cal.App.4th at p. 870, italics omitted.)

Moreover, Blake's assertion that the family court abused its discretion by awarding fees for work that was not reasonably necessary is not supported by the record. It is true that the court found in April 2018 that Langer's motion to disqualify one of Blake's attorneys had no merit, but the purported unreasonableness of that motion was brought to the attention of the court in opposition to Langer's prior motion for attorney fees, and the court presumably took that into consideration when it awarded Langer $125,000 in fees in July 2018. And the court's statement that "perhaps [Langer] has been too well represented given the number of subpoenas [his] counsel has issued and requests for relief he has filed" is not evidence that the court awarded fees for work that was not reasonable and necessary. The court made that statement *in the same December 2018 fee order* Blake challenges here, in which the court made an express finding that there was a "reasonable need" for the fees it awarded. We presume, as we must, that the court took into account the possible over-litigation by Langer's attorney when it determined the necessary and reasonable amount of fees to award. (*Jameson v. Desta, supra,* 5 Cal.5th at p. 609.)

In short, Blake has provided no basis for reversing the December 2018 fee order.

## 2. *The June 2019 Fee Order*

Blake challenges the June 2019 fee order on five grounds.[26] First, she contends the fee award was improper because fees under sections 2030 and 2032 can be awarded only upon a request made by a party. Second, she argues the court impermissibly made the award without current income and expense information. Third, she asserts the court improperly awarded fees as an "additional domestic support obligation." Fourth, she contends the court failed to comply with Code of Civil Procedure section 632 by issuing a statement of decision, as she had requested. Fifth, she argues the court did not have the authority to order that the attorney fees be paid from an ERISA-governed retirement account. None of the first four grounds has merit, and the fifth ground is moot.

### a. *Fees awarded without a request by a party*

Blake contends that the statues and rules are "explicit" that fees under those statutes can only be awarded upon the request of a party, pointing to language in section 2030, subdivision (a)(2) ("When a request for attorney's fees and costs is made, the court shall make [the

---

[26] Langer contends we are without jurisdiction to consider Blake's appeal from the June 2019 fee order because the fee award was subject to reallocation and therefore the order was nonfinal and nonappealable. He is incorrect. It is well established that orders for pendente lite fees and costs—which, under section 2030, subdivision (c) may be modified as reasonably necessary at any time, including after an appeal has been concluded—are directly appealable interlocutory orders because they direct the payment of money and are immediately enforceable. (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368.)

40

necessary] findings"), section 2032, subdivision (b) (which refers to orders that a party pay all or part of "the fees and costs requested"), and Rule 5.427 (setting forth the documents that must be filed "to request attorney's fees and costs").  She is mistaken.

First, there is nothing in the language of section 2030, subdivision (a)(2) to suggest a fee award may be made *only* when a request is made by a party.  It simply states that *when* a request is made, the court must make certain findings and must award attorney fees and costs if those findings "demonstrate disparity in access and ability to pay." (§ 2030, subd. (a)(2).)  In fact, subdivision (a)(1) provides that the court "shall ensure that each party has access to legal representation . . . by ordering, if necessary based on the income and needs assessment, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding."  (§ 2030, subd. (a)(1).)  This language certainly suggests that the court has a duty to order an award of fees if necessary, regardless whether a party makes a request in the first instance.

Second, even if section 2030, subdivision (a)(2) could be interpreted to mean that a party must request attorney fees before the court may award fees, the plain language of subdivision (c) would limit that requirement to the original request for fees.  That provision states that "[t]he court shall augment or modify the original award for attorney's fees and costs as may be reasonably necessary for the

41

prosecution or defense of the proceeding."[27] (§ 2032, subd. (c).) Of course, if the court determines that augmentation or modification of the original award is necessary, the court must provide notice and hold a hearing before it can augment or modify it (§ 2031, subd. (a)(1)), and any award must be based upon findings that "the making of the [augmentation] award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties" (§ 2032, subd. (a)).[28]

---

[27] Contrary to Blake's assertion, *Hobdy*, *supra*, 123 Cal.App.4th 360, does not hold that section 2030, subdivision (c) is just "an avenue to seek 'reconsideration'" of prior orders granting or denying attorney fee requests. Rather, the court simply observed that a request for augmentation of a prior fee order may in fact be a vehicle for requesting reconsideration of a prior award.

[28] For this reason, Blake's reliance on *Mooney v. Superior Court* (2016) 245 Cal.App.4th 523 is misplaced. In that case, the wife was appealing from the judgment in a marital dissolution case, and filed a motion in the family court for a settled statement for the appeal. (*Id.* at p. 526.) At the first hearing on the wife's motion, the court announced it was going to award attorney fees to the husband's attorney for her work responding to the wife's proposed settled statement. (*Id.* at p. 528.) At a hearing 17 days later, the court ordered the wife to pay the husband's attorney $10,000 in fees based on its findings that the wife's conduct during the underlying action had prolonged the litigation, and that the wife had the financial ability to pay the fees. (*Id.* at p. 529.) Relying upon section 2031, which provides that "an application for a temporary order making, augmenting, or modifying an award of attorney's fees . . . shall be made by motion on notice or by an order to show cause," the appellate court found that the lower court erred because no motion or order to show cause was made. (*Mooney v. Superior Court*, *supra*, 245 Cal.App.4th at p. 535.) In contrast, in the present case, the June 2019 fee order was an augmentation award under section 2030, subdivision (c) that was made after the family court issued an OSC that gave the parties notice and an opportunity to be heard.

42

Third, the language from section 2032 and Rule 5.427 that Blake cites has nothing to do with whether a party must make a request for an award of fees in the first instance. For example, Blake quotes a snippet of the following sentence from section 2032: "The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested." (§ 2032, subd. (b).) And the sentence from Rule 5.427 that she excerpts merely sets forth what information must be provided "[w]hen attorney's fees are requested by either party." (Cal. Rules of Court, rule 5.427(d)(2).) These references to "requests" made by a party do not signal a legislative intent to authorize the court to make an award of attorney fees only when a party initiates the request. Rather, they reflect the fact that the court may award only those fees that have been incurred or are likely to be incurred. Thus, regardless who initiates the process for a fee award, the party to whom fees are to be awarded ultimately must show what fees have been or are likely to be incurred, i.e., the party must "request" a certain amount of fees.

In this case, the family court initiated the process to augment its earlier fee award by issuing an order to show cause. Such a procedure is permitted under the Family Code. Indeed, as the court observed, "'[t]he vicissitudes of family law proceedings dictate that trial judges must have maximum flexibility in ensuring that each party has the means to pay for counsel. To hold otherwise would frustrate those policies.'" (Quoting *Hobdy*, *supra*, 123 Cal.App.4th at p. 371.)

43

b.    *Purported absence of income and expense information*

Blake's argument that the court impermissibly made the award without current income and expense information is meritless. The court had volumes of evidence showing both parties' income and expenses, including analyses from each party's forensic accountant. It also had heard and considered evidence from Blake regarding ProSocial's declining business, and had several of the I&Es she had filed, showing income that ranged from negative $44,244 in June 2018 to more than $100,000 in September 2018. Although that evidence had been submitted more than three months before the court issued the June 2019 fee order, it gave the court a deep understanding of the parties' financial circumstances. Moreover, from very early in the litigation, both the parties and the court acknowledged that neither party had sufficient income to pay attorney fees, and the funds would have to come from the equity in the family residence or the parties' retirement accounts. And there is no question that the court had very current information regarding the value of those assets: less than two months before issuing the fee order, the court heard testimony from the real estate broker regarding the efforts to sell the residence, and Blake filed a declaration stating the amount of funds in one of her retirement accounts the month before the fee order. Thus, we conclude the court had sufficient information regarding the parties' current financial circumstances to determine "the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).)

44

c.      *Fees awarded as a domestic support obligation*

Blake's attempt to create an issue based upon the family court's reference to the fee award as "a family support obligation" is disingenuous.  The court did not, as Blake implies, state it was awarding the attorney fees as a form of support.  Instead, it merely observed—correctly—that an order to pay attorney fees under section 2030 would not be dischargeable in bankruptcy.  (See *In re Marriage of Kochan* (2011) 193 Cal.App.4th 420, 431 ["The bankruptcy statutes provide that a petitioner's domestic support obligations are not dischargeable in bankruptcy, and attorneys' fees orders in dissolution actions are encompassed in this rule"].)

d. *Failure to comply with Code of Civil Procedure section 632*

Blake filed a request for a statement of decision under Code of Civil Procedure section 632 before the hearing on the family court's OSC regarding augmentation of its attorney fee award, asking for findings on 38 separate issues.  The family court declined Blake's request.  Blake's assertion that the trial court erred by failing to file a statement of decision is meritless.  It is well established that a court is not required to issue a statement of decision after ruling on a motion or, in this case, an order to show cause.[29]  (*In re Marriage of Feldman*

---

[29]     Blake cites to *In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262 in support of her argument, but that case is irrelevant here, inasmuch as it involved a family court's failure to file a properly requested statement of decision following a trial that resulted in a judgment.

45

(2007) 153 Cal.App.4th 1470, 1497; *In re Marriage of Askmo* (2000) 85 Cal.App.4th 1032, 1040.)

### e. *ERISA*

We need not address whether it was error for the family court to order that the fees it awarded in the June 2019 fee order be paid from Blake's retirement account, because the issue is moot. On November 14, 2019, after the family residence was sold, the court entered an order that changed the source of the funds; instead of being paid from Blake's retirement account, they will be paid from the proceeds of the sale of the residence.[30] We have granted Langer's request that we take judicial notice of that order. As a result of that order, we have no cause to address the ERISA issues Blake raises.

## B. *Joinder*

Blake contends the family court erred in granting Langer's motion for joinder because the Blake policy at the center of the parties' dispute was a term life insurance policy that was owned by the 2012 Blake trust, rather than a party to the dissolution action, and, in any event, the policy now is lapsed for failure to pay the premium.[31] Therefore, she asserts there is no basis on which to join Daniel and Steven to the

---

[30] While the November 14, 2019 order does not specifically state that the court has changed the source of the funds to pay the attorney fees, that is its clear implication.

[31] Blake has filed a request for this court to take judicial notice of a January 3, 2020 letter from Brighthouse to the 2012 Blake trust stating that the Blake policy lapsed on December 17, 2019. We grant that request.

dissolution action. Langer contends in his respondent's brief that the issues Blake raises are moot in light of the lapse of the Blake policy, and that Blake forfeited any other arguments regarding the propriety of the joinder by failing to raise them in her appellant's opening brief. In her reply brief, Blake contends she did not forfeit her argument that there was misjoinder for other reasons because she "spent nearly five pages of her Opening Brief with persuasive argument, requiring no case citation, as to why the belatedly raised tort, conspiracy and abuse of process claims first presented in [Langer's] Joinder Complaint . . . would result in a misjoinder as to both parties and issues." Blake is incorrect.

"'Appellate briefs must provide argument and legal authority for the positions taken.' [Citation.] 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' [Citation.] If an argument in an appellate brief is supported by only an opinion or argument of appellant's counsel without 'citation to any recognized legal authority,' that argument may be deemed waived for failure to present supporting substantive legal analysis. [Citations.]" (*In re A.C.* (2017) 13 Cal.App.5th 661, 672.)

In the present case, Blake's opening brief identified three "Questions Presented," all of which related to the Blake policy, and whether it was appropriate to join Daniel and Steven for the purpose of enjoining them from transferring the policy from the 2012 Blake trust or changing the beneficiaries. The "five pages of . . . persuasive argument" in her opening brief regarding why the joinder was improper

47

for other reasons included no discussion of any applicable law.  Indeed, it neither discussed nor analyzed the actual allegations of the joinder complaint.  It was simply a conclusion that there was misjoinder.  Therefore, Blake has forfeited any claim of error.

## DISPOSITION

The orders of December 12, 2018 and June 4, 2019 are affirmed. Langer shall recover his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.

We concur:


MANELLA, P. J.


COLLINS, J.